**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Myrick Dennis, with the Cleveland Field Office of the United States Postal Inspection

Service (USPIS), having first been duly sworn according to law, hereby depose and say:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant under

Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the

location of the cellular telephone assigned the following call number:

> a.   **(216) 280-7111**, IMSI: **310410235523349**, no subscriber (believed to be
>
> used by Aaron CANTIE), service provided by AT&T, (hereinafter
>
> "PROVIDER") (TARGET PHONE);

2.      The TARGET PHONE is described herein and in Attachment A, and the location

information to be seized is described herein and in Attachment B.

3.      Because this warrant seeks the prospective collection of information, including

cell-site location information, that may fall within the statutory definitions of information

collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the

requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-

3127. The requested warrant therefore includes all the information required to be included in an

order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1) and Attachment C.

4.      As a United States Postal Inspector, I am an "investigative law enforcement

officer" of the United States of America within the meaning of Title 18, United States Code,

Section 2510(7). I am empowered by law to conduct investigations of, and to make arrests for,

offenses related to the U.S. Postal Service (USPS) and the mails, as authorized by Title 18,

United States Code, Section 3061.

5.      I have been employed by the USPIS for 8 years and assigned to the Cleveland

Field Office for each of those 8 years. During this time, I have been assigned to the Contraband

Interdiction and Investigations team, which investigates the mailing of illegal drugs and their

proceeds. Since October 2020, I have been deputized as a Task Force Agent with the Drug

Enforcement Administration (DEA) Cleveland District Office and assigned to the Tactical

Diversion Squad. I have been the case agent in multiple investigations leading to convictions in

both U.S. District Court and state courts.

6.      I have received training in the detection and investigation of prohibited mailing

offenses during a residential Basic Inspector Training program in Potomac, Maryland. I have

also received training in financial investigations as they relate to drug trafficking organizations,

money laundering, and asset forfeiture. I have received field training and participated in many

aspects of USPIS drug investigations, including but not limited to, parcel interdiction,

surveillance, controlled deliveries, execution of search warrants, interview and interrogation,

confidential source/cooperating witness debriefing, and interception and analysis of electronic

communications. I have written and executed search warrants that have resulted in the seizure of

illegal drugs and evidence of drug violations. I am familiar with drug traffickers' methods of

operation, especially as they relate to the Postal Service, including the storage, transportation,

and distribution of drugs, the transfer and collection of money which represents the proceeds of

drug trafficking, and money laundering.

7.      I know from my training and experience that the U.S. Mail is often used by drugs

traffickers to transport controlled substances. I further know that the Priority Mail system is

commonly used to transport controlled substances because this system provides reliability,

traceability, and timely delivery.

2

8.      I know from my training and experience that the success of professional Drug Trafficking Organizations (DTOs) depends upon maintaining extensive contacts throughout the country and internationally. Specifically, individuals involved in drug trafficking must maintain contact with drug suppliers, drug couriers, drug customers, and others involved in the supply, transportation, distribution, sales, and marketing of controlled substances.

9.      I know from my training and experience that drug traffickers often utilize other individuals, sometimes known as, among other slang, "mules," for certain tasks pertaining to their drug trafficking activity, such as receiving drug parcels and transporting drug parcels on their behalf, in order to attempt to insulate themselves from any connection to the drugs. These "mules" often provide and use addresses that are not otherwise associated with the drug traffickers, sometimes known as "drop" addresses, to further provide anonymity for the illicit activities. I know from my training and experience that drug traffickers often compensate these "mules" with currency.

10.      Based upon my training and experience, I know that communication through electronic devices – such as through telephone calls, texts, chat, email, instant messaging, and other applications – enables drug distributors to maintain constant contact with associates, drug suppliers, and customers. I know that it is common for DTOs to use these applications to communicate with associates relating to the logistics of their drug trafficking business and store information (purposely or inadvertently) relating to their unlawful activities.

11.      Based on my training and experience, I know that monitoring the location of a drug trafficker's cell phone will often lead to relevant evidence in a drug trafficking investigation.  This location information can often lead to the discovery of stash houses, meeting places for drug deals, and the locations and identities of other individuals involved in the drug

3

trafficking activities. This is especially true where, as the facts in this case show, the drug trafficking activity is ongoing in nature.

12.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal observations, my training and experience, information obtained from other law enforcement officers, information obtained from witnesses, and my review of records and reports pertaining to this investigation. Unless otherwise noted, whenever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed. Such statements are set forth in this affidavit in substance or in pertinent part unless otherwise indicated. Furthermore, since this affidavit is being submitted for the limited purpose of securing a warrant authorizing the disclosure of precision location information for the TARGET PHONE, I have not included the details of every aspect of the investigation.

13.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, U.S. Code, Sections 841(a)(1), 843(b) and 846: to wit, distributing and possessing with the intent to distribute controlled substances, using a telephone in furtherance of drug trafficking, and conspiring to distribute controlled substances have been committed by **AARON CANTIE, TRAVIS EZEKIEL**, and others known and unknown. There is also

4

probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations.

14.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

15.     The United States, including USPIS and DEA, is conducting a criminal investigation of **AARON CANTIE, TRAVIS EZEKIEL**, and others known and unknown regarding possible violations of Title 21, U.S. Code, Sections 841(a)(1), 843(b) and 846.

16.     On September 16, 2022, while reviewing USPS business records, a USPIS contract analyst identified seven USPS Priority Mail parcels sent from the Phoenix, Arizona, area to three addresses in the Cleveland, Ohio, area and suspected to contain controlled substances. On September 20, 2022, I obtained federal search warrants from the Honorable Jennifer Dowdell Armstrong, U.S. Magistrate Judge for the Northern District of Ohio, for the seven parcels, bearing the following tracking numbers and more fully described below:

    a.   9505 5110 2621 2258 4734 71 addressed to Terri Palmer, 27260 Tungsten Rd, Euclid, OH 44132, and having a return address of Gems by Lisa LLC, 1651 S. Dobson Rd, Mesa, AZ 85202 (Tungsten Parcel 3471). The parcel was further described as brown cardboard box weighing approximately 1 pound 3 ounces and measuring approximately 6" x 6" x 6". The parcel was mailed on September 15, 2022, from Phoenix, AZ 85029 and bears $14.75 in U.S. postage.

b. 9505 5110 2621 2258 4734 88 addressed to Terri Palmer, 27260 Tungsten Rd, Euclid, OH 44132, and having a return address of Gems by Lisa LLC, 1651 S. Dobson Rd, Mesa, AZ 85202 (Tungsten Parcel 3488). The parcel was further described as brown cardboard box weighing approximately 1 pound 1 ounce and measuring approximately 6" x 6" x 6". The parcel was mailed on September 15, 2022, from Phoenix, AZ 85029 and bears $14.75 in U.S. postage.

c. 9505 5136 4112 2258 3337 12 addressed to Ms. Collins, 27260 Tungsten Rd, Euclid, OH 44132, and having a return address of Everything Covered LLC, 1030 S. Dobson Rd., Mesa AZ 85202 (Tungsten Parcel 3712). The parcel was further described as brown cardboard box weighing approximately 12 ounces and measuring approximately 6" x 6" x 6". The parcel was mailed on September 15, 2022, from Phoenix, AZ 85004 and bears $10.90 in U.S. postage.

d. 9505 5152 5526 2258 0027 42 addressed to Ms. Collins, 27260 Tungsten Rd, Euclid, OH 44132, and having a return address of Everything Covered LLC, 1030 S. Dobson Rd, Mesa AZ 85202 (Tungsten Parcel 2742). The parcel was further described as brown cardboard box weighing approximately 1 pound 4 ounces and measuring approximately 6" x 6" x 6". The parcel was mailed on September 15, 2022, from Glendale, AZ 85308 and bears $16.10 in U.S. postage.

e. 9505 5152 5526 2258 0027 35 addressed to Mrs. William, 12513 Soika Ave, Cleveland, OH 44120, and having a return address of Everything Covered LLC, 1030 S. Dobson Rd, Mesa AZ 85202 (Soika Parcel 2735). The parcel was further described as brown cardboard box weighing approximately 1 pound 3 ounces and

6

measuring approximately 6" x 6" x 6". The parcel was mailed on September 15, 2022, from Glendale, AZ 85308 and bears $16.10 in U.S. postage.

f.   9505 5152 5526 2258 0027 28 addressed to Mrs. William, 12513 Soika Ave, Cleveland, OH 44120, and having a return address of Everything Covered LLC, 1030 S. Dobson Rd, Mesa AZ 85202 (Soika Parcel 2728). The parcel was further described as brown cardboard box weighing approximately 1 pound 4 ounces and measuring approximately 6" x 6" x 6". The parcel was mailed on September 15, 2022, from Glendale, AZ 85308 and bears $16.10 in U.S. postage.

g.   9505 5110 2621 2258 4734 64 addressed to Janice Crocker, 12515 Soika Ave, Cleveland, OH 44120, and having a return address of Gems by Lisa LLC, 1651 S. Dobson Rd, Mesa, AZ 85202 (Soika Parcel 3464). The parcel was further described as brown cardboard box weighing approximately 1 pound 5 ounces and measuring approximately 6" x 6" x 6". The parcel was mailed on September 15, 2022, from Phoenix, AZ 85029 and bears $14.75 in U.S. postage.

17.   On the same date, Postal Inspector Michael Adams as witnessed by Postal Inspector Joshua Gardner executed the warrants, resulting in the seizure of seven quantities of blue circular tablets coded as 30mg oxycodone, a Schedule II controlled substance, and totaling approximately 1.75 kilograms. Each of the seven parcels contained a quantity of the blue circular tablets, which based on my training and experience, likely contain not oxycodone, but clandestinely manufactured fentanyl, a Schedule II controlled substance (laboratory results pending). The tablets were concealed in gum containers wrapped in multiple layers of wet wipes, dryer sheets, clear cellophane, and clear tape, and cushioned with packing peanuts. I know from

7

my training and experience that mailed controlled substances are often packaged and concealed in a similar manner.

18.     I also know from training and experience that these tablets were very likely to contain fentanyl, a Schedule II controlled substance. Fentanyl is now commonly produced and sold in a tablet form, frequently referred to as a pill, that looks identical to a 30mg oxycodone tablet (M30), instead of in powder or chunk form. M30 fentanyl pills are often more appealing to end users, since ingesting a pill often carries less stigma for a user than injecting fentanyl. These illicit fentanyl pills are commonly manufactured in Mexico, and then smuggled into border states such as California, Arizona, New Mexico, and Texas. From there, it is common to see fentanyl pills shipped throughout the United States through the US Mail and other common carriers. Other Postal Inspectors and I have participated in numerous seizures of M30 fentanyl pills that had been mailed from Arizona to Ohio.

19.     On September 23, 2022, I queried USPS business records and found several unique telecommunications identifiers associated with Charter Communications, Inc. (Charter), Lumen Technologies, and Verizon Wireless, which had inquired on the delivery status of some of the seven drug parcels listed above, as well as two historical parcels that were previously delivered and not seized, as detailed in the Charter section below. I served subpoenas on these companies and received the responses detailed below:

　　a.　On September 26, 2022, Lumen Technologies (a telecommunications company) certified that the above identifiers belonged to Lumen account number 1500035696 in the name of Teara CAMMON, 1350 W Van Buren St Apt 3059, Phoenix, AZ 85007, email cammonteara@gmail.com, phone 216-513-7003, service established August 25, 2022. This account tracked Soika Parcels 3464 and

8

2735. According to queries in CLEAR, an investigative tool that provides access to multiple proprietary and public records and has proven reliable in previous investigations, Aaron D. CANTIE, date of birth January XX, 1988, has multiple credit records at 1350 W Van Buren St Apt 3059, Phoenix, AZ 85007, and a potential phone number of **216-280-7111 (the TARGET PHONE)**. CANTIE has a criminal history with convictions for drug trafficking, drug possession, felonious assault, and improperly handling firearms in a motor vehicle. Additionally, CAMMON's phone (216-513-7003) is the second most frequent contact of CANTIE's phone (**216-280-7111  - the TARGET PHONE**), according to analysis of tolls between August-September 2022.

b.  On September 27, 2022, Charter certified that the above identifiers belonged to two accounts: (1) Charter account number 8361102962253308 in the name of Ronnie PRATT, 10303 Kempton Ave, Cleveland, OH 44108, email amirisimpson20@gmail.com, phone 216-413-0659, activation date August 24, 2022 (this Charter account tracked Soika Parcel 3464); and (2) Charter account number 8361102962016002 located at 515 Euclid Ave, Cleveland, OH 44114, which is the location of The Beacon, a luxury residential high-rise building owned by Stark Enterprises.[1] This Charter account tracked Soika Parcel 3464 as well as two historical USPS Priority Mail parcels, which were not seized, but appeared to be related to this investigation. Those two historical USPS parcels that the Charter

---

[1] I subsequently spoke with Stark Enterprises security and IT personnel who advised that even though the entire building utilizes one Charter internet account, each unit at The Beacon has its own wireless network to access the building's internet service. As of October 20, 2022, The Beacon's security and IT personnel are working with Charter personnel to attribute the parcel tracking activity to a specific unit within The Beacon.

account tracked bore tracking numbers 9505 5119 4114 2194 9362 14 and 9505 5119 4114 2194 9362 21 both addressed to Mrs. Marshall, 11809 Ashbury, Cleveland, OH 44106, and both having a return address of Linda Thompson, 16601 N 75th Ave, Peoria, AZ 85382 (hereinafter "Ashbury Parcels 6214 and 6221"). According to USPS records, these two parcels were mailed from Phoenix, AZ 85013 on July 13, 2022, delivered on July 15, 2022, weighed 1 pound 1 ounce, bore $14.75 in U.S. postage, and appeared to utilize the same type of outer box as the seven seized M30 pill parcels described above.

c. On October 6, 2022, Verizon Wireless certified that the above identifiers belonged to Verizon account number 342218870-1, subscriber Travis EZEKIEL, business name Ground Zero Towing LLC, 11813 Saywell Ave, Cleveland, OH 44108, phone 216-507-7343, home phone 216-804-3248, email 229tex@gmail.com, activation date July 14, 2018. This Verizon phone number (216-507-7343) tracked Soika Parcels 2728 and 2735 as well as Tungsten Parcel 2742. According to CLEAR queries, EZEKIEL has multiple credit, driver's license, and vehicle records at 11809 Ashbury Avenue, Cleveland, OH 44106 (the delivery address of the two historical USPS parcels discussed above). Additionally EZEKIEL's 216-507-7343 Verizon phone number is the sixth most frequent contact of CANTIE's **216-280-7111** phone (**the TARGET PHONE**), according to analysis of tolls for August-September 2022.

20.     On September 29, 2022, I conducted open-source research and found a baby registry on thebump.com for Teara CAMMON (the account holder of the Lumen Technologies account that tracked the delivery status of Soika Parcels 3464 and 2735) and Aaron CANTIE

10

with a due date of March 2, 2021, located in Cleveland, OH. Additionally, according to the Ohio

Secretary of State, the articles of organization for Everything Covered LLC, which was the

business listed as the sender on four of the seven seized parcels above, are dated July 28, 2020,

in the name of Teara CAMMON, 4712 East 94th, Garfield Heights, OH 44125, authorized

representative Aaron CANTIE. Finally, according to USPS business records queries, a USPS

customer account exists with User ID 331432873 in the name of Aaron CANTIE, 750 Huron Rd

E Down, Cleveland, OH 44115, email info@everythingcoveredllc.com, phone **216-280-7111**

**(the TARGET PHONE)**, last login on September 8, 2022, at 14:02:29, utilizing the same

unique Charter telecommunications identifier that was attributed to The Beacon luxury

apartments, as described above.

21.     On October 4, 2022, Financial Investigator Kristina Hlavaty served a subpoena on

Stark Enterprises (The Beacon luxury apartments) for a rent roster of all current tenants. On the

same date, I received the response and identified Unit 1102 (11th floor) in the name of Janan

HALL, date of birth March XX, 1990, phone 216-650-6191, email jananhall@gmail.com,

occupy date April 1, 2022, as a likely residence for CANTIE. HALL's 216-650-6191 phone is

the most frequent contact of CANTIE's **216-280-7111** phone **(the TARGET PHONE)**

according to analysis of tolls for August-September 2022.

22.     On October 5, 2022, I reviewed surveillance video from The Beacon luxury

apartments, and found that at approximately 2:00 a.m. that day, HALL traveled down an elevator

from the 11th floor to the main lobby to meet CANTIE, and the two traveled back up together

and exited at the 11th floor. CANTIE and HALL appeared to be romantically involved with each

other.

23.     On October 12, 2022, I received information from a Pittsburgh, Pennsylvania,

area task force comprising investigators from the Federal Bureau of Investigation (FBI) and

Homeland Security Investigations (HSI) regarding Title III court-authorized interceptions of

telephone communications between CANTIE[2] utilizing phone number **216-280-7111** (the

**TARGET PHONE**) and EZEKIEL utilizing phone number 216-507-7343.  Below, I detail some

of the times where CANTIE and his **216-780-7111** phone (**the TARGET PHONE**) were

intercepted as part of that Title III wiretap (as identified by the session number in that Title III

case):

    a. [Sessions 3201 and following] On July 15, 2022, beginning at approximately

       11:21 a.m. and continuing until approximately 8:14 p.m., CANTIE utilizing

       phone number **216-280-7111 (the TARGET PHONE)** and EZEKIEL utilizing

       phone number 216-507-7343 spoke during several conversations about Ashbury

       Parcels 6214 and 6221, as well as USPS Priority Mail parcel bearing tracking no.

       9505 5119 4112 2194 8998 56 addressed to Ms. Hudson, 2106 W 96th Street,

       Cleveland, OH 44102, and having a return address of Mrs. Gardner, 7455 N 95th

       Ave, Glendale, AZ 85305 (W 96th Parcel 9856)[3]. EZEKIEL told CANTIE that he

---

[2] I believe phone number 216-280-7111 was previously misattributed by investigators from the Pittsburgh task force
to Aaron A. Jackson, DOB 7/XX/1993, based on a surveillance observation of a black male driving a vehicle
registered to Jackson; I believe this black male was in fact CANTIE.

[3] Another parcel, described as USPS Priority Mail parcel bearing tracking no. 9505 5136 4112 2258 3337 05
addressed to Ms. Wells, 2106 W. 96th St, Cleveland, OH 44102, and having a return address of Everything Covered
LLC, 1030 S Dobson Rd., Mesa, AZ 85202, was mailed in the same transaction as the seized Tungsten Parcel 3712,
and was delivered without being seized on September 17, 2022. This parcel weighed 1 pound 4 ounces, bore $14.75
in U.S. postage, and appeared to utilize the same type of outer box as each of the seven seized parcels, Ashbury
Parcels 6214 and 6221, and W 96th Parcel 9856. Based on the common characteristics with the seized parcels as well
as the communications interceptions, I believe those that were delivered without being seized contained some type
of contraband and possibly controlled substances.

had been watching the USPS Letter Carrier since 8:00 a.m. that day and waiting

for two parcels to be delivered, stating that he ran out of gas at one point.

CANTIE told EZEKIEL that the online tracking showed one address would be

delivered by 4:30 p.m. and another by 7:45 p.m.; CANTIE was likely tracking

these parcels from the Beacon luxury apartments as explained in Paragraph 17b.

At approximately 12:54 p.m., according to USPS business records, Ashbury

Parcels 6214 and 6221 were delivered. At approximately 12:55 p.m., EZEKIEL

informed CANTIE he saw the Letter Carrier deliver both parcels, and at

approximately 12:58 p.m., CANTIE asked EZEKIEL if he retrieved both parcels,

which EZEKIEL affirmed. EZEKIEL described to CANTIE how he knew how

tall the Letter Carrier was, his hair cut, and recalled his tattoos so well that he

could draw them. CANTIE then told EZEKIEL that he was still waiting for his

parcel on the west side. At approximately 1:31 p.m., CANTIE asked EZEKIEL if

he had opened the two parcels yet to make sure they had not been tampered with,

to which EZEKIEL said he had not. EZEKIEL expressed his relief that the parcels

were delivered on time so that he could open them alone at his residence while his

sister and others were still at work.  CANTIE expressed pride that he had chosen

an inconspicuous address where these two parcels could be sent. At

approximately 3:34 p.m., CANTIE told EZEKIEL he was still waiting for his

parcel, stating that the online tracking showed an expected delivery of 7:45 p.m.,

but CANTIE had not seen any USPS Letter Carriers or vehicles. At

approximately 6:58 p.m., according to USPS business records, W 96th Parcel

9856 was delivered. At approximately 8:13 p.m., CANTIE instructed EZEKIEL

to bring him one of the parcels. EZEKIEL asked if he should bring everything because he was not sure what kind of drug transaction CANTIE had planned, to which CANTIE reiterated that EZEKIEL should not bring everything but rather bring only one parcel.

b.  [Session 4265] On July 22, 2022, beginning at approximately 10:19 a.m. and continuing until approximately 10:44 a.m., CANTIE utilizing phone number **216-280-7111 (the TARGET PHONE)** and EZEKIEL utilizing phone number 216-507-7343 spoke about CANTIE being out of "blues," which is slang for blue circular tablets coded as 30mg oxycodone but instead containing clandestinely-manufacturer fentanyl. CANTIE asked EZEKIEL to bring him 1,000 tablets, for which CANTIE already had a deal planned. CANTIE said he had $5,000 on hand, and when he sold the 1,000 tablets would make another $5,000, which combined would allow him to pay off a $10,000 debt he and EZEKIEL owed. EZEKIEL affirmed he would bring the tablets to CANTIE once he counted them.

c.  [Session 5222] On August 2, 2022, beginning at approximately 10:30 a.m. and continuing until approximately 10:36 a.m., CANTIE utilizing phone number **216-280-7111 (the TARGET PHONE)** and EZEKIEL utilizing phone number 216-507-7343 spoke about quantities, prices, and profit margins for "blues." CANTIE told EZEKIEL that "Squeaky" gave him a couple thousand blues the previous day. CANTIE went on to describe how he can purchase 40,000 tablets for $20,000, sell them for a low $1 each, and still make a $20,000 profit.

24.    In my training and experience, I have learned that wireless providers such as the PROVIDER are companies that provides cellular telephone access to the general public. I also

14

know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

25.     Based on my training and experience, I know that the PROVIDER can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the TARGET PHONE on the PROVIDER's network or with such other reference points as may be reasonably available.

26.     Based on my training and experience, I know that the PROVIDER can collect cell-site data about the TARGET PHONE. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the

duration of the communication. I also know that wireless providers such as the PROVIDER typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

### AUTHORIZATION REQUEST

27.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

28.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscribers or user(s) of the TARGET PHONE would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

29.     I further request that the Court direct the PROVIDER to disclose to the government any information described in Attachment B that is within the possession, custody, or control of the PROVIDER. I also request that the Court direct the PROVIDER to furnish the

government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the PROVIDER services, including by initiating a signal to determine the location of the TARGET PHONE on the PROVIDER's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the PROVIDER for reasonable expenses incurred in furnishing such facilities or assistance.

30.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the TARGET PHONES outside of daytime hours.

31.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

Respectfully submitted,

MYRICK DENNIS
UNITED STATES POSTAL INSPECTOR

Sworn to via telephone after submission by reliable
electronic means. Fed. R. Crim. P. 4.1 and 41(d)(3) at 11:33 a.m.

JENNIFER DOWDELL ARMSTRONG
UNITED STATES MAGISTRATE JUDGE

October 25, 2022 at 11:33 a.m.
DATE

18